## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| SIMEX INC., et al.,[1] | Case No. 24-10083 (TMH) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

**VERIFIED PETITION OF FOREIGN REPRESENTATIVE FOR (I) RECOGNITION OF CANADIAN PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Deloitte Restructuring Inc., in its capacity as the authorized foreign representative ("Deloitte" or the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"), which are the subject of jointly-administered proceedings (the "CCAA Proceedings") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), submits this verified petition (together with the form petitions filed simultaneously herewith, the "Verified Petition") for recognition of the CCAA Proceedings with respect to each of the Debtors as "foreign main proceedings" and certain related relief pursuant to sections 105(a), 1507, 1510, 1515, 1517, 1519, 1520 and 1521 of title 11 of the United States Code (the "Bankruptcy Code").

In support of the Verified Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Canadian Proceedings as Foreign Main Proceedings, (II) Recognition of*

---

[1] The chapter 15 debtor incorporated in Canada and/or in the province of Ontario (the "Canadian Debtor"), along with the last four digits of the Canadian Debtor's Canadian business number, is: SimEx Inc. ("SimEx") (5222). The chapter 15 debtors incorporated in the United States (the "U.S. Debtors"), along with the last four digits of each U.S. Debtor's federal tax identification number, are: Iwerks Entertainment, Inc. ("Iwerks"), (9361) and SimEx-Iwerks Myrtle Beach, LLC ("SIMB") (8417). (The Canadian Debtor and the U.S. Debtors are referred to herein, collectively, as the "Debtors" or "SimEx"). The Debtors' executive headquarters are located at: 210 King St East, 600, Toronto, Ontario, Canada, M5A 1J7.

*Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Deloitte Declaration") and (b) the *Declaration of Roger Jaipargas in Support of Verified Petition for (I) Recognition of Canadian Proceedings as Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Jaipargas Declaration"), each of which are incorporated herein by reference. The Foreign Representative has also filed the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion") concurrently herewith.

## PRELIMINARY STATEMENT

1.          On January 19, 2024, Deloitte was duly appointed by the Canadian Court as the Monitor for SimEx, Iwerks, and SIMB and, in that capacity, as their duly authorized Foreign Representative. Deloitte filed the Chapter 15 Petitions commencing these Chapter 15 Cases as ancillary proceedings to the CCAA Proceedings and respectfully files this Verified Petition for Recognition contemporaneously with the required accompanying documentation pursuant to sections 1501, 1504, 1509 and 1515 of the Bankruptcy Code.

2.          The Debtors have commenced these Chapter 15 Cases to facilitate the fair and efficient administration of the CCAA Proceedings and an orderly and successful sale and investment solicitation process through those proceedings (the "SISP"). These Chapter 15 Cases serve a critical role in effectuating the investment in and/or sale of the Debtors' business and assets which will be implemented as part of an extensive process conducted through the CCAA Proceedings. Specifically, these Chapter 15 Cases will prevent the Debtors' stakeholders, many of whom have contacts with the United States and are subject to personal jurisdiction of the Court, from commencing actions in the United States that are more properly the subject of the CCAA Proceedings or that will interfere with the orderly administration of the CCAA Proceedings. Recognition of the CCAA Proceedings will, among other things, ensure that the SISP, as implemented through the CCAA Proceedings, is respected in the United States. For the reasons set forth herein, the Foreign Representative submits that the relief requested in this Verified

Petition is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

3.      The Debtors operate a single, united business enterprise specializing in "4D" motion rides and cinematic attractions.  They operate in the "theatre attraction" space and rely heavily, if not exclusively, on tourism.

4.      The Debtors have suffered losses primarily due to the COVID-19 pandemic ("COVID") and the associated lockdowns, and a slower-than-expected return to pre-COVID business levels.  In addition, the Debtors had invested considerable time and resources into projects that have been delayed or terminated coming out of COVID.

5.      As a result, the Debtors are currently experiencing a liquidity crisis and will be unable to satisfy go-forward obligations such as payroll, rent, and licensing fees without the protections afforded by the CCAA and Chapter 15 of the Bankruptcy Code, including immediate access to interim funding to be provided in the CCAA proceedings.

6.      The Debtors are headquartered and managed out of Toronto, Ontario and operate out of five leased facilities located in Canada and the US.  The US operations are reliant on the Canadian parent to continue in business.  The Debtors currently have seventy-six (76) employees, with more than sixty percent (60%) of them located in the United States.

7.      The Debtors are insolvent.  They are indebted to their secured creditors in the approximate amount of $16,000,000 and to their unsecured creditors in excess of $7,000,000.  The Debtors have been operating at net losses for each of the past three years.  In each year, they have recorded annual losses of approximately $3,000,000.  More importantly, the Debtors are unable to meet their obligations as they become due.

8.      The Debtors require the protection from their creditors afforded by Chapter 15 of the Bankruptcy Code to bring stability to the business, allow the Debtors to access the interim funding provided in the CCAA Proceedings, and to implement a sale and investment solicitation process ("SISP") in those proceedings, which is designed to serve the interests of all stakeholders.

9.　　　In consultation with their senior secured lender, Royal Bank of Canada ("RBC"), and Deloitte, the Debtors commenced the CCAA Proceedings with the Canadian Court to obtain the financing required to meet their necessary expenses and to facilitate the SISP. The Debtors and Deloitte have determined that the best path forward to maximize value for their stakeholders is through a court-supervised SISP under the CCAA and to seek the protections afforded under Chapter 15 of the Bankruptcy Code to permit this process to move forward without the risk of disruption potentially presented by the Debtors' creditors exercising remedies against the Debtors and their assets in the U.S.

10.　　　On January 19, 2024, the Canadian Court conducted an initial hearing in the CCAA Proceedings (the "Initial CCAA Hearing") and entered an interim order (the "Initial CCAA Order"), a copy of which is attached to the Chapter 15 Petitions.  The Initial CCAA Order provides for, *inter alia*, (i) the appointment of Deloitte as the monitor with enhanced powers (the "Monitor"); (ii) an initial 10-day stay of proceedings against the Debtors and their directors and officers; (iii) the provision of interim debtor in possession financing from RBC (the "DIP Financing"); and (v) various administration and directors' and officers' charges.  The Initial CCAA Order scheduled a further hearing (the "Comeback Hearing") for January 29, 2024 at 11:00 a.m. (prevailing Toronto time), at which hearing the Debtors will seek the approval of an amended and restated initial order (the "Amended and Restated Initial CCAA Order")[2] that provides, *inter alia*, for an extension of the stay of the proceedings to May 3, 2024 and for approval of the procedures governing the SISP.  At the conclusion of the SISP, if it is successful, a further motion will be brought in the CCAA Proceedings to seek approval of the transaction or transactions resulting from the SISP.  The following is a summary of the relief granted with respect to the stay, the DIP Financing, and the SISP in the Initial CCAA Order and the anticipated relief to be granted in the Amended and Restated Initial CCAA Order:

---

[2] A copy of the proposed Amended and Restated Initial CCAA Order with a blackline showing changes from the Initial CCAA Order is filed simultaneously herewith.

| Relief | Initial Order ("IO") | Proposed Amended and Restated Initial Order ("ARIO") |
|---|---|---|
| Stay of Proceedings | 10 days – January 19 to 29, 2024 | 95 days – January 29 to May 3, 2024 |
| Administration Charge (First priority)[3] | $390,000 | $500,000 |
| DIP Charge (Second priority) | $200,000 | $600,000 |
| Directors Charge (Third priority) | $230,000 | $300,000 |
| SISP | No relief, Court advised of SISP, but not approved | Approval of SISP, implement SISP January 29 to May 3 (outside date) |

## JURISDICTION AND VENUE

11.	The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P). The statutory bases for the relief requested herein are sections 105(a), 1504, 1507, 1510, 1515, 1517, and 1521 of the Bankruptcy Code.

12.	These Chapter 15 Cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition of the CCAA Proceedings under section 1515 of the Bankruptcy Code.

13.	The Foreign Representative confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

14.	Venue is proper in this district pursuant to 28 U.S.C. § 1410. Two of the three Debtors are incorporated in the U.S., one of which is incorporated in Delaware (Iwerks) and one

---

[3] Charges are in USD and listed in their priority ranking. The amount sought in the ARIO is the total amount of the proposed charges.

of which holds 100% of the stock of Iwerks (SimEx).  Additionally, as more particularly described below, the Debtors have cash held in U.S. bank accounts, tangible assets, corporation stock, leasehold interests, and/or contract rights in the United States.

## RELIEF REQUESTED

15.     Deloitte requests that this Court enter an order, substantially in the form attached hereto as **Exhibit A**, and pursuant to sections 105(a), 306, 362, 363, 364, 1502, 1504, 1507, 1509, 1510, 1515, 1517, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, that provides, among other things, the following relief (collectively, the "Relief Requested"):

      a.    Recognizing the CCAA Proceedings as foreign main proceedings (as defined in section 1502(4) of the Bankruptcy Code) pursuant to section 1517 of the Bankruptcy Code;

      b.    Recognizing the Monitor as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code;

      c.    Enforcing and giving full force and effect in the United States to the CCAA Proceedings and the Initial CCAA Order, including any and all extensions or amendments to that order as authorized by the Canadian Court on a final basis;

      d.    Protecting the rights of creditors and protecting and maximizing the value of Debtors' assets, in accordance with section 1501 of the Bankruptcy Code;

      e.    Providing Deloitte, if and/or when appropriate, additional assistance contemplated by section 1507 of the Bankruptcy Code;

      f.    Granting Deloitte all rights afforded by section 1509 of the Bankruptcy Code, including, but not limited to (i) Deloitte's capacity to sue in a court in the United States, (ii) Deloitte's right to apply directly to a court in the United States for appropriate relief in

6

such court, and (iii) the requirement that a court in the United States shall grant comity or cooperation to Deloitte;

g.    Granting Deloitte all of the relief afforded pursuant to section 1520 of the Bankruptcy Code, including but not limited to the "automatic stay" under section 362 of the Bankruptcy Code, and the application of sections 363, 549, and 552 pertaining to transfers of an interest of Debtors' in property—all of which shall apply with respect to Debtors and their property that is now or in the future located within the territorial jurisdiction of the United States;

h.    Staying the commencement or continuation of actions concerning the Debtors' assets, staying execution of the Debtors' assets, suspending any right to transfer, encumber or otherwise dispose of any of the Debtors' assets, and providing for the examination of witnesses or taking evidence concerning the Debtors' assets, affairs, rights, obligations or liabilities, consistent with section 1521 of the Bankruptcy Code;

i.    Providing that Deloitte may intervene in any proceedings in State or Federal court in the United States in which Debtors may be parties;

j.    Granting pursuant to section 1521 of the Bankruptcy Code (or section 1507 as the Court deems necessary) on a final basis any provisional relief requested in the Emergency Motion for Provisional Relief;

k.    Pursuant to section 1519(a)(3) and 1521(a)(7) of the Bankruptcy Code, providing that section 108 of the Bankruptcy Code is made applicable to the Debtors in these Chapter 15 Cases; and

l.    Providing such other and further relief as the Court deems just and proper.

## BACKGROUND

16.      The Debtors operate in the "4D" movie and theatre industry.  This industry features custom formatted movies, typically for immersive screen viewing, and customized theatres which feature extra-sensory experiences (e.g., from embedded speakers to "rumble seats" to wind, water or other environmental elements).  The aim of a "4D" movie and theatre is to make the audience feel like they are "in" the film.

17.      SimEx was one of the founding members of this industry when the company was formed by Moses Znaimer in 1984.  The company's first project was the "Tour the Universe" Ride at the CN Tower.

18.      In 2002, SimEx acquired California-based Iwerks Entertainment, Inc., centralizing management in Canada and maintaining Iwerks as a wholly-owned operating subsidiary of SimEx in the US, based in Los Angeles and Baltimore.

19.      In 2016, the Debtors incorporated SIMB, as a special purpose, wholly-owned operating subsidiary of Iwerks in South Carolina (discussed below).

20.      The Debtors' products are featured in theatres and motion rides at tourist attractions in Canada and the US, as well as other places in the world.  The Debtors have produced 4D films and have an active catalogue of more than 125 films available for license.  The Debtors design and build theatre attraction facilities under contract.  The Debtors also manage and operate theatre attraction facilities.

### Corporate Structure

### SimEx

21.      SimEx is the parent company and directs all activities of the business enterprise. Michael Needham is the president and sole director of SimEx.

22.      SimEx is incorporated under the laws of the Province of Ontario.

23.      SimEx is the production, design and manufacturing arm of the business enterprise.  SimEx carries out three following primary functions:

a. ***4D Film Production*** – SimEx produces 4D film content for theatre attractions, by utilizing existing works under license which SimEx edits and formats for immersive experiences;

b. ***Attraction Design, Manufacturing & Support*** – SimEx designs all elements of its theatre attractions, each of which is tailored to suit the particular customer's demands and limitations. SimEx then fabricates and installs all elements of the attractions and provides replacement service and support. SimEx provides attraction, design, manufacturing and support to customers around the world; however, the majority of these attractions are in North America and China; and

c. ***Graphic Design*** – SimEx provides tailored graphic design, production and support services for theatre attractions it has helped to design and build, for theatre attractions using its licensed films or, more rarely, for attraction operators simply requesting custom graphic design services.

24.     All of SimEx's services are marketed and sold directly, but also through Iwerks. In the latter case, the ultimate customer is a third-party and Iwerks acquires products and services from SimEx, who invoices and collects from Iwerks.

### Iwerks

25.     Iwerks is a wholly-owned subsidiary of SimEx. Michael Needham is the President and sole director of Iwerks.

26.     Iwerks is incorporated under the laws of the State of Delaware.

27.     Iwerks is the sales and service arm of the business enterprise. Iwerks carries out three primary functions:

a. ***Attraction Co-Ventures*** – Iwerks partners with a theatre attraction owner/operator and provides all of the required equipment and the

owner/operator provides and funds all other requirements (e.g., premises leases, insurance, employees). Attraction co-ventures typically proceed under a revenue sharing agreement with the owner/operator, but some are fixed fee agreements, paid over time;

b. ***Licensing 4D Films*** – Iwerks licenses 4D films to various attraction owner/operators in exchange for royalty revenues; and

c. ***Customer Services*** – Iwerks provides service and repairs, and tech services to co-venture partners and licensees.

28.     Iwerks relies on SimEx for all its attraction equipment and 4D films, which SimEx invoices for and Iwerks, in turn, charges to its customers. Iwerks is wholly reliant on SimEx to continue its business.

## SIMB

29.     SIMB is a wholly-owned subsidiary of Iwerks. Michael Needham is the President and sole director of SIMB.

30.     SIMB is incorporated under the laws of the State of South Carolina.

31.     SIMB was incorporated for a single purpose. Iwerks had an opportunity to develop and operate a top-tier theatre attraction without a co-venture partner. Accordingly, SIMB was created to pursue this opportunity.

32.     SIMB operates a licensed attraction in Myrtle Beach, South Carolina known as "The Simpsons in 4D". The attraction comprises a theatre and convenience store/gift shop created to provide visitors with a 4D immersive movie and physical attraction experience based on "The Simpsons" cartoon series.

33.     Like Iwerks, SIMB relies on SimEx for all its attraction design services, equipment and film content, for which SimEx invoices. SIMB is wholly reliant on SimEx to continue its business.

**Other Subsidiaries**

34.     In addition to Iwerks and SIMB, SimEx also has four (4) other subsidiaries – namely: 6618391 Canada Inc., 6618359 Canada Inc., Cinema 4D Inc. and SimEx Santa's Late Inc. However, these subsidiaries were incorporated for specific film production projects which were completed or aborted. These subsidiaries are inactive. These subsidiaries (the "Non-Debtor Subsidiaries") are not Debtors in these cases.

**Places of Business and Facilities**

35.     The Debtors operate out of five leased facilities located in Canada and the US.

Corporate Office

36.     Head office functions are largely conducted out of a 16,033 square-foot office space located at 210 King Street East Suite #600, Toronto, Ontario (the "Corporate Office"). The Corporate Office is leased from Allied Properties by SimEx under a lease agreement dated October 14, 2017. SimEx pays rent for the Corporate Office of CAD $68,671 per month, plus HST, and the lease term ends on March 31, 2028. SimEx is currently one month in arrears under the Corporate Office lease.

**Production Facility**

37.     The design and production of attraction hardware and installations is conducted out of a warehouse located at 2299 Drew Rd, Mississauga, ON L5S 1A3 (the "Production Facility"). The Production Facility is a 28,512 square-foot warehouse and production facility with some office spaces. The Production Facility is leased from Desjardins Financial by SimEx under a lease agreement, most recently amended on July 16, 2020. SimEx pays rent for the Production Facility of CAD $28,536 per month, plus HST, and the lease term ends on June 30, 2024. SimEx is currently one month in arrears (CAD $28,536 + HST) under the Production Facility lease.

**Distribution and Technical Services Office**

38.     The acquisition of film rights and the distribution and licensing of 4D films and attraction services are conducted by Iwerks out of an office located at 25030 Avenue Tibbitts, Suite F, Santa Clarita, California (the "Distribution Office"). The Distribution Office is a 4,320

11

square-foot office.  The Distribution Office is leased from Rediger Investment Corporation by Iwerks under a lease agreement dated April 1, 2022.  Iwerks pays rent for the Distribution Office of USD $5,780 per month, plus applicable taxes.  The lease term ends on February 28, 2025. Iwerks is currently one month in arrears (USD $5,780 + applicable taxes) under the Distribution Office lease.

### Attraction Co-Venture Office

39.     The attraction co-venture division is conducted by Iwerks out of an office located at 600 Red Brook Boulevard, Suite 440, Owings Mills (Baltimore), Maryland (the "ACV Office").  The ACV Office is a 3,353 square-foot office.  The ACV Office is leased from 600 Red Brook, LLC by Iwerks under a lease agreement dated June 2, 2021.  Iwerks pays rent for the ACV Office of USD $6,147 per month, plus applicable taxes.  The lease term ends on July 31, 2026. Iwerks is currently one month in arrears (USD $6,147 + applicable taxes) under the ACV Office lease.

### Attraction Site

40.     The Simpson 4D experience is operated by SIMB from a rented property located at 1199 Celebrity Circle, Myrtle Beach, South Carolina (the "Attraction Site").  The Attraction Site is an 8,800 square foot facility featuring an attraction site comprising a movie theatre and convenience store/gift shop.  The Attraction Site is leased from Broadway at the Beach, Inc. (Burroughs & Chapin) by SIMB under a lease agreement dated May 12, 2017.  SIMB pays rent for the Attraction Site of USD $35,456 per month, plus applicable taxes.  The lease term ends on June 28, 2028.  SIMB is currently two months in arrears (USD $70,912) under the Attraction Site lease.

### Employees

41.     The Debtors currently employ seventy-six (76) individuals.

> a.     forty-seven employees work for SimEx, all are full-time;

> b.     sixteen employees work for Iwerks, all are full-time;

c.      thirteen employees work for SIMB, including five full-time and eight part-time employees.

42.      Employees are paid biweekly in arrears.  The Debtors are current on all payments to employees except for expense reports that may not yet have been submitted. However, without access to the interim DIP funding granted in the CCAA proceedings, the Debtors would have been unable to fund payroll for the week of January 22, 2024.

43.      None of the employees are unionized or otherwise subject to a collective bargaining agreement in connection with their employment with any Debtor.

44.      The Debtors do not sponsor, administer or otherwise have any registered or unregistered pension plans for any Canadian or American employees.  SimEx offers Canadian employees an RRSP contribution program.  Iwerks offers a 401k plan administration to its American employees (extended to one salaried employee of SIMB).  All payments under such plans are current.

45.      The Debtors provide a standard group benefit plan to their employees that covers extended heath care, dental care, life insurance, and accidental death and dismemberment insurance.

46.      Additionally, the Debtors have several contactors and agents operating around the world.  Agents are paid on a commission basis for sales.

47.      The Debtors were forced to drastically reduce their staff during COVID.  Once reopening began, the Debtors began to rehire, but at a very conservative rate.  The Debtors are presently operating at minimal staffing levels and do not believe there is any more room for staff reductions, without imperiling the business and the prospect of a successful SISP.

**Customers**

48.      The Debtors have a diverse set of customers which license and operate theatre attractions, in some cases for their own facilities and in other cases as service providers to third parties.  Although the Debtors have longstanding relationships with various customers, in the majority of cases, each film/project is the subject of a stand-alone agreement for one or more of

the services the Debtors provide.  Equally, payment and license terms are on a case-by-case basis. In the case of most of Iwerks' co-ventures, the co-venture partner is obligated to license the Debtors' films for the duration of the co-venture agreement.

### Key Suppliers

49.     The Debtors have longstanding relationships with different film studios as suppliers of intellectual property.  These dealings can be categorized broadly as follows:

> a.    *Licensing of Existing Films* – The Debtors license existing films (often back catalogue titles) from studios and edit such films to suit a 4D theatre attraction.  This includes both enhancing thematic elements of such films and shortening them for the purposes of a theatre attraction "ride".  In turn, the Debtors sublicense such films to end-users and pay royalties to the subject studio; and
>
> b.    *Original Licensed Content* – Although not as common as the licensing of existing films, the Debtors will from time to time create original content.

50.     The Debtors key studio partners included Warner Brothers and Disney, each of whom are owed royalties.  These relationships are governed by various merchandising, licensing and distribution agreements.

### Cash Management & Accounting

51.     All finance and accounting functions of the business enterprise are directed by SimEx and, specifically, SimEx's CFO.

52.     In the ordinary course of business, the Debtors maintain accounts for SimEx through RBC in Canada, including a CAD Account, USD Account and distinct foreign exchange account for other currencies.  In the US, independent accounts are maintained for Iwerks and SIMB through Wells Fargo.

53.     All accounts are administered by SimEx's finance department, headed by the CFO in Toronto, Ontario, including:

14

    a.      collection of accounts receivable from third parties;

    b.      administration of intercompany receivables ("Intercompany Receivables");

    c.      disbursements to fund payroll and benefits, capital expenditures, maintenance costs, payments to inventory vendors and other service providers; and

    d.      intercompany cash transfers and accounts amongst various Applicant entities ("Intercompany Transfers").

54.      Intercompany Receivables are amounts due and owing between the Debtors. Nearly all Intercompany Receivables are due to SimEx by Iwerks (with indirect receivables due from SIMB to Iwerks and, in turn, to SimEx). SimEx is not only the parent company and seat of control for the business enterprise but also the supplier of all products and services provided by its subsidiaries. SimEx has funded all the attraction equipment design, manufacturing and installation for Iwerks' co-ventures and for the SIMB attraction, and the overwhelming proportion of films licensed by Iwerks. The costs of these supplies are recorded as intercompany accounts receivable/payable on the Debtors' respective accounting records. SimEx also receives regular management fees, accounting fees and graphic design fees from its subsidiaries.

55.      Intercompany Transfers are payments made by one Debtor to another. Intercompany Transfers are made on an "as needed" basis to ensure that each Debtor has sufficient working capital and liquidity to meet its needs. Intercompany Transfers are only recorded in the Debtors' financial statements and are not recorded via promissory notes or other debt instruments.

56.      The Debtors utilize five operating bank accounts. SimEx banks with the RBC in Canada. Iwerks and SIMB bank with Wells Fargo in the US (collectively, the "Bank Accounts"). An overview of the Bank Accounts is as follows:

    a.      RBC Canadian dollar account owned by SimEx (the "RBC CAD Account"). The RBC CAD Account receives CAD payments to

SimEx, whether from Iwerks or a third-party, as well as to fund payroll, vendor payments, production costs and taxes;

b.   RBC American dollar account owned by SimEx (the "RBC USD Account").  The RBC USD Account receives USD payments to SimEx, whether from Iwerks or a third-party, as well as to fund payroll, vendor payments and taxes;

c.   RBC foreign exchange account owned by SimEx (the "RBC Forex Account").  The RBC Forex Account is used to receive foreign currency payments (i.e., non-CAD or non-USD) and converts the same into USD or CAD as required by SimEx;

d.   Wells Fargo USD account owned by Iwerks (the "Iwerks Account"). The Iwerks Account is used to collect customer payments to Iwerks, as well as to fund payroll, vendor payments and taxes; and

e.   Wells Fargo USD account owned by SIMB (the "SIMB Account"). The SIMB Account is used to fund SIMB payroll, vendor payments and taxes.

57.   The Initial CCAA Order provides certain relief with respect to the Debtors' access to and use of their Bank Accounts in the ordinary course during the CCAA Proceedings, subject to certain cash flow forecasts and the oversight of the Monitor.

## Financial Circumstances

58.   The Debtors' fiscal year end is December 31.  For the fiscal years ended 2021 and 2022, the Debtors recorded annual losses of approximately USD $3,000,000.  As of October 2023, the Debtors' year-to-date annual loss was approximately USD $2,600,000.  The Debtors have insufficient funds to pay their obligations as they come due.

## Assets

59.   As of October 31, 2023, the Debtors, on a consolidated basis, had total assets of approximately USD $26,500,000, consisting of approximately USD $4,500,000 of current

16

assets (accounts receivable, prepaid expenses and deposits, inventories, and HST refunds recoverable) and approximately USD $22,000,000 of non-current assets (advanced royalties, property and equipment, attraction programs, product design and development, and intangible assets).

60.       The following shows a breakdown of the Debtors' assets as at October 31, 2023:

| | Oct 31, 2023 |
|---|---|
| | (unaudited) |
| **ASSETS** | |
| **Current** | |
| Receivables | 2,814,740 |
| Inventories | 903,427 |
| Work in progress | 71,800 |
| Prepaids | 446,347 |
| Current portion of advanced royalties | 300,000 |
| **Total current assets** | **4,536,314** |
| | |
| **Long-term assets** | |
| Advanced royalties | 31,348 |
| Property and equipment | 12,627,994 |
| Attraction programs | 2,694,532 |
| Product design and development | 478,421 |
| Goodwill | 6,180,950 |
| **Total assets** | **26,549,559** |

## Liabilities

61.       As of October 31, 2023, the Debtors, on a consolidated basis, had liabilities totaling approximately USD $29,600,000 consisting of approximately USD $18,700,000 of current liabilities (bank indebtedness, accounts payable, lease liabilities, and current loan payables) and approximately USD $10,800,000 of non-current liabilities (lease liabilities and long-term loan payables).

4887-2109-8400, v. 2

62.     The following shows a breakdown of the Debtors' liabilities as of October 31, 2023:

| LIABILITIES AND SHAREHOLDERS' EQUITY | |
|---|---|
| **Current** | |
| Bank indebtedness | 5,593,038 |
| Payables and accruals | 6,912,578 |
| Income taxes payable | 282,960 |
| Deferred revenue | 1,290,196 |
| Current portion of bank term loans | 1,391,245 |
| Current portion of BCAP/HASCAP term loans | 1,817,387 |
| Current portion of BDC term loan | 1,400,000 |
| **Total current liabilities** | **18,687,404** |
| | |
| **Long-term liabilities** | |
| Bank term loans | 3,562,299 |
| BCAP/HASCAP term loans | 2,236,671 |
| BDC term loan | - |
| Other long-term liabilities | 5,096,146 |
| **Total liabilities** | **29,582,520** |

## Cash Flow Forecast

63.     The Debtors, with the assistance of the Monitor, have prepared a projected, extended cash flow forecast for the period ending May 3, 2024, that is premised on, among other things, the protections granted in the CCAA Proceedings and access to immediate DIP funding.

## The Debtors' Creditors

## Secured Creditors

64.     As of January 12, 2024, the Debtors' have aggregate secured debt obligations of approximately USD $16,100,000 summarized as follows:

        a.      approximately CAD $6,757,555 due to RBC;

        b.      approximately USD $9,633,782 due to RBC; and

        c.      approximately USD $1,400,000 due to BDC Capital (as defined below).

65.     RBC is the Debtors' senior secured creditor, holding a senior secured interest against each of the Debtors' assets, property and undertakings in Ontario, as well as in the US.

66.     SimEx has banked with RBC for many years, amending its debt and security documents from time to time.  Most recently SimEx, as borrower, executed an amended and restated loan agreement (the "RBC Loan Agreement") with RBC dated March 31, 2023.

67.     Pursuant to the RBC Loan Agreement, the previous lending agreement was amended and restated, and RBC agreed to provide four (4) credit facilities to SimEx:

a.      a revolving demand facility in the maximum amount of USD $6,000,000;

b.      a revolved facility in the maximum amount of USD $5,500,000;

c.      a multi-draw term loan in the maximum amount of CAD $6,250,000; and

d.      a non-revolving term loan in the amount of CAD $3,125,000.

The facilities above are in addition to any leases or foreign exchange forward contracts outstanding with RBC, at any time.  As well, the third and fourth facilities listed above were made possible with the support of the Export Development Canada ("EDC") Business Credit Availability Program.  The RBC Loan Agreement is governed by and is to be construed and interpreted in accordance with the laws of the Province of Ontario.

68.     As security for the obligations under the RBC Loan Agreement, the Debtors reaffirmed all existing first-ranking security granted to RBC through various guarantees provided by Iwerks and SIMB, assignments, security agreements and pledges (the "RBC Security").

69.     As of January 12, 2024, the Debtors are jointly and severally indebted to RBC under the RBC Loan Agreement, secured by the RBC Security, in the approximate amounts of CAD $6,757,555 and USD $9,633,782.

70.     In addition to the foregoing, on July 20, 2021, SimEx entered into a credit facility agreement with RBC in connection with the Business Development Bank of Canada's Highly Affected Credit Availability Program (the "HASCAP Credit Agreement"), pursuant to which SimEx borrowed CAD $1,000,000 at an annual interest rate of 4.0%, with monthly payments of principal and interest commencing thirteen months after drawdown and repayable in full on July 31, 2026.  The obligations of SimEx under the HASCAP Credit Agreement are secured by the RBC Security.

71.      The RBC Security is registered against SimEx and Iwerks in Ontario, under the *Personal Property Security Act* and against SimEx and SIMB in the US, under the *Uniform Commercial Code*.

72.      As discussed below, RBC has a first-ranking security interest in respect of each of the Debtors, by reason of its registrations and intercreditor agreement with Debtors' other secured lender, BDC Capital Canada, a wholly-owned subsidiary of Business Development Bank of Canada ("BDC Capital").

### RBC Demand

73.      As of January 8, 2024, there is CAD $6,758,710.52 and USD $9,767,838.15 outstanding under the RBC Loan, plus costs continuing to accrue.

74.      On January 12, 2024, RBC formally noted the Debtors in default and issued demand for repayment and notices of intention to forces security under section 244 of the Canadian Bankruptcy and Insolvency Act.

75.      Notwithstanding the forgoing, RBC has been supporting the Debtors.  Since January 2, 2024, the Debtors have been in default of their payment obligations on the RBC Loan.  And, as discussed herein, RBC has agreed to provide interim financing to facilitate the CCAA Proceedings.

### BDC Capital

76.      On June 15, 2018, SimEx, as borrower, entered into a commitment letter with BDC Capital as lender, which was further amended by letter agreement dated June 27, 2018 (collectively, the "BDC Loan").  Pursuant to the BDC Loan, BDC Capital agreed to advance USD $2,500,000 in two tranches.  The maturity date was June 1, 2022.  The purpose of the loan was to fund SimEx's construction of "The Simpson" 4D theatre attraction Myrtle Beach, SC, operated by SIMB, which was sold to SimEx's subsidiaries and recorded as intercompany receivables.

77.      As security for the obligations under the BDC Loan, the Debtors executed certain guarantees, security agreements and assignments in favor of BDC Capital (the "BDC Capital Security").

78.     As of January 12, 2024, the Debtors are jointly and severally indebted to BDC Capital under the BDC Loan, secured by the BDC Capital Security, in the approximate amount of USD $1,410,000.  As discussed below, BDC Capital has subordinated its security in favor of RBC. The BDC Loan is governed by and is to be construed and interpreted in accordance with the laws of the State of New York.

### Equipment Financiers

79.     In addition to the foregoing, the Debtors were also party to certain secured and unsecured equipment financings with Wells Fargo Equipment Finance Company and De Lage Landen Financial Services Canada.  As of the date of this Petition, the Debtors are current on their equipment finance obligations.

80.     On June 29, 2018, the Debtors, Non-Debtor Subsidiaries, RBC and BDC Capital executed an intercreditor agreement pursuant to which BDC Capital agreed to subordinate its security against the Debtors in favor of RBC, save and except for BDC Capital's interest in a corporate life insurance policy held by the Debtors.

### Crown Obligations and Priority Claimants

81.     SimEx is current on Canadian Harmonized Sales Tax ("HST") payments through to January 12, 2024.  Going forward, HST remittances will be paid as reflected in the Debtors' projected cash flow.

82.     The Debtors are also current on all source deductions, and they are funded to the Debtors' payroll providers as part of the normal payroll cycle.

83.     The Debtors are current on all US source and tax obligations.

### Unsecured Creditors

84.     The Debtors have unpaid trade and other unsecured debt accrued in the normal course of business.  As of January 12, 2024, the Debtors' accounts payable and accrued unsecured liabilities are in excess of USD $7,000,000.

## **THE CCAA PROCEEDINGS**

**A.      Initial Relief Sought in CCAA Proceedings.**

85.      In their initial application in the CCAA Proceedings, among other procedural matters, the Debtors sought the following relief:

a.      declaring that the Debtors are companies to which the CCAA applies;

b.      granting a stay of proceedings in favor of the Debtors and its directors and officers for an initial period of ten (10) days, up to and including January 29, 2024 (the "Stay Period"), which is the maximum initial period permitted by the statute;

c.      appointing Deloitte as the court-appointed monitor of the Debtors (in such capacity, the "Monitor");

d.      granting an administration charge in the amount of USD $500,000 over the assets, undertakings and property of the Debtors in favor of counsel for the Debtors, the Monitor and the Monitor's counsel (the "Administration Charge"), subject to limited application during the initial 10-day Stay Period;

e.      approving an interim loan facility (the "DIP Loan") on terms of the interim loan agreement (the "DIP Term Sheet") between the Debtors, as borrowers, and RBC, as interim lender (the "DIP Lender"); and, a DIP financing charge in the amount of USD $600,000 (the "DIP Lender's Charge"), subject to limited application during the initial Stay Period;

f.      approving a charge in favor of the current directors and officers of the Debtors in the amount of USD $300,000 (the "D&O Charge"), subject to limited application during the initial 10-day Stay Period;

22

4887-2109-8400, v. 2

g. approving the SISP process and procedures substantially in the form submitted to the Canadian Court (the "SISP"); and

h. scheduling a comeback hearing ("Comeback Hearing") for January 29, 2024.

## B.     The Initial CCAA Order

86.     On January 19, 2024, the Canadian Court conducted an initial hearing in the CCAA Proceedings (the "Initial CCAA Hearing") and entered the Initial CCAA Order.  The Initial CCAA Order includes the following "stay" provisions to be in force during the Stay Period:

a. THIS COURT ORDERS that until and including January 29, 2024, or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

b. THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower an Applicant to carry on any business which such Applicant is not lawfully entitled to carry on,

23

(ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

c.      THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honor, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, license, sublicence, authorization or permit in favor of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

d.      THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicant or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Business or the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service

provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

e.       THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

Initial CCAA Order, ¶¶ 13-16, 18.

87.       The Initial CCAA Order also approved the DIP Loan in accordance with the DIP Term Sheet between the Debtors and the DIP Lender, the DIP Lender's Charge, the Administration Charge, and the D&O Charge, subject to limited application during the Stay Period.

88.       Finally, the Initial CCAA Order expressly requests that courts in the United States recognize the CCAA Proceedings and grant representative status to the Monitor to aid and assist the Canadian Court in carrying out the terms of the Initial CCAA Order.  Paragraphs 52 and 53 of the Initial CCAA Order provide as follows:

a.       THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Applicant, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals,

regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicant and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

b.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Applicants to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended.

*Id*. at ¶¶ 52–53.

89.    The Canadian Court did not approve the SISP process and procedures at the Initial CCAA Hearing but deferred that matter to the Comeback Hearing scheduled for January 29, 2024.

## BASIS FOR RELIEF

90.    The Debtors seek the protection of this Court afforded to foreign debtors under chapter 15 of the Bankruptcy Code to recognize the legal effect of the CCAA Proceedings and the protections provided therein in the United States, to prevent the disruption of their ongoing US business operations through the potential adverse actions of their creditors, and to recognize the

SISP and any investment or sale transaction that may result therefrom. These protections will facilitate the fair and efficient administration of cross-border insolvencies, such as the CCAA Proceedings and maximize the value of the Debtors' estates for the ultimate benefit of all stakeholders, who will continue to benefit from the exercise of their respective rights to participate in the CCAA Proceedings. See 11 U.S.C. § 1501.

### I.     The Debtors Are Eligible for Chapter 15 Relief.

91.     To be eligible for chapter 15 relief, Debtors must meet the general eligibility requirements under section 109(a) of the Bankruptcy Code as well as the more specific eligibility requirements under section 1517(a) of the Bankruptcy Code. In addition, the Petition for Recognition must meet the requirements of section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). If these elements are satisfied, the Bankruptcy Court must grant recognition. *See In re Black Gold S.A.R.L.*, 635 B.R. 517, 527 (B.A.P. 9th Cir. 2022) ("Congress' use of the word 'shall' in § 1517(a) removed the court's discretion in determining recognition if the requirements in the three subparagraphs of § 1517(a) have been satisfied.").

92.     Section 109(a) of the Bankruptcy Code, which applies to cases under Chapter 15, provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). Thus, under section 109(a), a foreign debtor must reside or have a domicile, a place of business or property in the United States to be eligible to file a chapter 15 petition. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013). Deloitte maintains that the Debtors satisfy the requirements of Section 109(a).

93.     Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code because they have property in the United States in one or more of the following forms: cash held in U.S. bank accounts; tangible assets; corporation stock; leasehold interests; and/or contract rights. Additionally, two of the Debtors are entities incorporated in the United

States with their principal assets and operations located in the United States.  For these reasons, the Debtors satisfy the requirements under section 109(a) of the Bankruptcy Code.

## II.     The CCAA Proceedings Should Be Recognized as Foreign Main Proceedings.

94.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . . within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a).  Deloitte satisfies all such requirements.

### A.     The Canadian Proceedings are Foreign Proceedings.

95.     The Canadian Proceedings are foreign proceedings under section 101(23) of the Bankruptcy Code.  Courts routinely recognize Canadian insolvency proceedings, including Canadian CCAA cases, as "foreign proceedings." *See, e.g., In re Yatsen Group of Companies Inc., et al.*, No. 21-10073 (BLS) (Bankr. D. Del. February 24, 2021) (ECF No. 42) (recognizing Canadian proceeding commenced under Canada's Companies' Creditors Arrangement Act as a foreign main proceeding); *In re Hematite Holdings Inc., et al.*, No. 20-12387 (Bankr. D. Del. October 15, 2020) (ECF No. 35) (same); *In re Chiang*, 437 B.R. 397, 401 (Bankr. C.D. Cal. 2010) (recognizing debtor's Canadian case under the Bankruptcy and Insolvency Act as a foreign main proceeding); *In re Innua Canada Ltd.*, No. 09-16362 (DHS), 2009 WL 1025090, at *4 (Bankr. D.N.J. Apr. 15, 2009) (recognizing Canadian receivership proceedings as "foreign main proceeding"); *In re Ernst & Young, Inc.*, 383 B.R. 773, 782 (Bankr. D. Colo. 2008) (same).

96.     Section 101(23) requires that a "foreign proceeding" be (i) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt; (ii) pending in a foreign country; and (iii) under the supervision of a foreign court, for the purpose of reorganizing or liquidating the assets and affairs of the debtor.  *See* 11 U.S.C. § 101(23).  The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  *See* 11 U.S.C. § 1502(3).

Courts have held that a "foreign proceeding" is one:

a.     in which acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;

b.     that has either a judicial or an administrative character;

c.     that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.     that is located in a foreign country;

e.     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.     which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight and Control Comm'n of Avánzit*, S.A., 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).

As set forth in the Jaipargas Declaration, the Canadian Proceedings satisfy such requirements and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy Code.

### B. The Foreign Proceedings Should be Recognized as "Foreign Main Proceedings" under Section 1502 of the Bankruptcy Code.

97.     Under section 1502 of the Bankruptcy Code, the term "foreign main proceeding" means "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). Section 1516 of the Bankruptcy Code establishes a rebuttable presumption that the debtor's registered office is the debtor's center of main interests

("CoMI").  See 11 U.S.C. § 1516(c).  When considering a debtor's CoMI, courts may consider the analogous concept of an entity's "principal place of business" or "nerve center."  *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 132 n.10 (2d Cir. 2013).  As such, courts will look to factors such as the location of the debtor's headquarters, the location of those who *actually* manage the debtor, and the location of the debtor's primary assets, among other things, to determine the foreign debtor's CoMI.  *Id*. at 130.

98.     SimEx is incorporated under the laws of the Province of Ontario, with its registered office located at 210 King St East, 600, Toronto, Ontario.  SimEx is the parent company and directs all activities of the business enterprise.  Consequently, there is a rebuttable presumption that the Debtors' CoMI is located in Canada.

### C.     These Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative.

99.     Deloitte in its capacity as Monitor is duly authorized to act as Foreign Representative in these Chapter 15 Cases because it is a foreign person or body petitioning for recognition, as required by section 1517(a) of the Bankruptcy Code.  Further, the term "foreign representative" is defined under section 101(24) of the Bankruptcy Code as:  a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.  11 U.S.C. § 101(24).

100.     Here, pursuant to the Initial CCAA Order, Deloitte was appointed as Monitor in the CCAA Proceedings to monitor the business and financial affairs of the Debtors with the powers and obligations set out in the CCAA and with the enhanced powers specifically set forth in the Initial CCAA Order.  Initial CCAA Order, ¶¶ 22-23.  In the Initial CCAA Order, the Monitor was specifically authorized and empowered to act as a representative in respect of the CCAA Proceedings for the purpose of having those proceedings recognized in a jurisdiction outside Canada, including "acting as a foreign representative of the Applicants to apply to the United

States Bankruptcy Court for relief pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended". *Id*. at ¶ 53.

101.    Accordingly, Deloitte is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code. *See also* 11 U.S.C. § 1516(a) ("If the decision [commencing the foreign proceeding] . . . indicates . . . that the person or body is a foreign representative, the court is entitled to so presume.").

**D.    The Petition for Recognition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).**

102.    These Chapter 15 Cases were duly and properly commenced by filing the Chapter 15 Petitions and this Verified Petition accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the filing of the Chapter 15 Petitions, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representative; and (d) a certified copy of the Initial CCAA Order. In addition, the Deloitte Declaration filed contemporaneously herewith constitutes further evidence of the existence of the Canadian Proceedings and of the appointment of Deloitte as the foreign representative as set forth in section 1515(b)(3) of the Bankruptcy Code.

103.    Having filed the above-referenced documents and because the Court is entitled to presume the authenticity of such documents filed in connection with the Chapter 15 Petitions under section 1516(b) of the Bankruptcy Code, the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) have been met, and these Chapter 15 Cases have been properly commenced. *See* 11 U.S.C. §§ 1504, 1509(a), 1515; Bankruptcy Rule 1007(a)(4).

31

### III.    The Discretionary Relief Requested Is Necessary and Appropriate to Effectuate the SISP and Should Be Granted.

104.     In connection with recognition of the CCAA Proceedings, the Foreign Representative seeks certain related relief, including enforcement of the Initial CCAA Order and the anticipated Amended and Restated Initial CCAA Order in the United States, and application of sections 361, 362, and 365(e) of the Bankruptcy Code in these Chapter 15 Cases. The Foreign Representative respectfully submits that such relief is warranted under sections 105(a), 1507, and 1521 of the Bankruptcy Code and the general principles of comity that underpin chapter 15.

105.     Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." Such relief may include:

> a.    staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;
>
> b.    staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) of the Bankruptcy Code;
>
> c.    suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and
>
> d.    granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title

32

or under other laws of the United States." 11 U.S.C. § 1507. Finally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

106.     The Foreign Representative requests the Court exercise its discretion under sections 105, 1507, and 1521 to grant the relief requested insofar as such relief exceeds that which is available by recognizing the CCAA Proceedings as a foreign main proceeding and the Foreign Representative as a "foreign representative" as specified in the Bankruptcy Code. The granting of such relief is consistent with the goals of international comity and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code and is necessary to the effectuate the Debtors' objectives in the CCAA Proceedings and the SISP.

107.     Indeed, as set forth above, by the Initial CCAA Order, the Canadian Court expressly requested the assistance of the courts in the United States. *See* Initial CCAA Order, ¶¶ 52–53. Thus, in addition to the reasons set forth above, this Court should give full force and effect in the United States to the Initial CCAA Order under well-established principles of international comity and specifically pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

108.     Fair and efficient administration of the CCAA Proceedings that protects all parties in interest requires that all creditors be bound by the terms of the CCAA Proceedings and SISP as sanctioned by the Canadian Court. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Energy Coal S.P.A.*, 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (acknowledging the broad principles of comity applied by U.S. courts in both recognition of foreign bankruptcies and post- recognition relief granted to foreign representatives).

109.     If the SISP ultimately approved by the Canadian Court, and any resulting sale of the Debtors' assets or other transaction thereunder that is approved by the Canadian Court, are not fully respected in the United States, there is a risk that certain of the Debtors' creditors and

contract or lease counterparties could exercise contractual remedies and/or initiate proceedings in the United States against the Debtors or other parties protected by the Initial CCAA Order and the anticipated Amended and Restated Initial CCAA Order. Such actions would likely result in the depletion of the Debtors' resources and would prejudice the value of their business enterprise. Therefore, the relief requested by the Debtors is required to prevent individual creditors acting to frustrate the purposes of the SISP and any resulting transaction by disregarding the binding Initial CCAA Order and anticipated Amended and Restated Initial CCAA Order, the objective of which is the fair and efficient administration of the CCAA Proceedings and the maximizing of value for all stakeholders.

### **Conclusion**

110.    The Foreign Representative respectfully submits that the Verified Petition satisfies the requirements for the recognition of Deloitte as the Debtors' "foreign representative" and the CCAA Proceedings as the Debtors' "foreign main proceedings" and further requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein.

### **Notice**

111.    The Foreign Representative will provide notice of this Motion consistent with Bankruptcy Rule 2002(q) and Local Rule 9013-1(m).  The Foreign Representative proposes to notify all creditors and parties in interest of the filing of the Petitions and the Foreign Representative's request for entry of the Order in the form and manner set forth in the *Motion for Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice*, filed contemporaneously herewith.  The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient, and no other or further notice need be provided.

### **No Prior Request**

112.    No prior request for the relief sought in this Verified Petition has been made to this or any other court.

WHEREFORE, the Foreign Representative respectfully requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

*[Remainder of page intentionally left blank.]*

Dated:  January 25, 2024

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Kristi J. Doughty (No. 3826)
Hercules Plaza
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
Tel. (302) 295-0191
Fax. (302) 295-0199
desgross@ChipmanBrown.com
doughty@ChipmanBrown.com


-and-

**PERKINS COIE LLP**

Tina N. Moss (*pro hac vice* pending)
1155 Avenue of the Americas
22nd Floor
New York, NY  10036
Tel. (212) 262-6900
Fax. (212) 977-1648
TMoss@perkinscoie.com

Paul Jasper (*pro hac vice* pending)
505 Howard Street
Suite 1000
San Francisco, California 94105-3204
Tel. (415) 344-7000
Fax. (415) 344-7050
PJasper@perkinscoie.com

***Attorneys for Foreign Representative***

## <u>VERIFICATION OF PETITION</u>

I, Jorden Sleeth, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am a Senior Vice President of Deloitte Restructuring Inc., the court-appointed Monitor and authorized Foreign Representative for the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Foreign Representative.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this 25th day of January 2024
Toronto, Ontario
Canada

Deloitte Restructuring Inc., solely in its
capacity as court-appointed Foreign
Representative and not in its individual or
corporate capacity


BY: */s/ Jorden Sleeth*
      Jorden Sleeth, Senior Vice President